71 P.3d 389

SCI MANAGEMENT CORPORATION; Hawaiian Memorial Park Cemetery; Hawaiian Memorial Life Plan, Ltd. dba Borthwick Mortuaries; and Derek Kim, Plaintiffs–Appellees,

v.

Darryllynne SIMS, and Tammy Quinata; Harry Yee, Faye Kennedy, Jack Law, June Motokawa, and Allycyn Hikada Tasaka, in their official capacities as Commissioners of the Hawai'i Civil Rights Commission, Department of Labor & Industrial Relations, State of Hawai'i; and William D. Hoshijo, in his official capacity as Executive Director of the Hawai'i Civil Rights Commission, Department of Labor & Industrial Relations, State of Hawai'i, Defendants–Appellants.

No. 24485.

Supreme Court of Hawai'i.

June 18, 2003.

Reconsideration Granted in Part July 9, 2003.

Gale L.F. Ching, of Hisaka Stone Goto Yoshida Cosgrove & Ching (Gale L.F. Ching, Mitzi A. Lee, Carter K. Siu, of Hisaka Stone Goto Yoshida Cosgrove & Ching, and Darwin L.D. Ching, on the brief), Honolulu, for the defendants-appellants Darryllynne Sims and Tammy Quinata.

Carl M. Varady, Special Attorney, Honolulu (Carl M. Varady, Eric K. Yamamoto, Jayna K. Kim and Carrie Anne Y. Shirota, on the brief), for the defendants-appellants Harry Yee, et al., in their official capacities as Commissioners of the Hawai‘i Civil Rights Commission, Department of Labor & Industrial Relations, State of Hawai‘i, and William D. Hoshijo, in his official capacity as Executive Director of the Hawai‘i Civil Rights Commission, Department of Labor & Industrial Relations, State of Hawai‘i.

Jeffrey S. Portnoy and Kristin S. Shigemura (Jeffrey S. Portnoy, David F.E. Banks, Kristin S. Shigemura, on the brief) of Cades Schutte Fleming & Wright, Honolulu, for the plaintiffs-appellees SCI Management Corp., et al.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., and ACOBA, J., Dissenting Separately.*

Opinion of the Court by LEVINSON, J.

The defendants-appellants Darryllynne Sims and Tammy Quinata [hereinafter, "the complainants"]; Harry Yee, Faye Kennedy, Jack Law, June Motokawa, and Allycyn Hikida Tasaka, in their official capacities as Commissioners of the Hawai‘i Civil Rights Commission, Department of Labor & Industrial Relations, State of Hawai‘i (HCRC) [hereinafter, "the commissioners"]; and William D. Hoshijo, in his official capacity as Executive Director of the HCRC [hereinafter, "the executive director"] [hereinafter, collectively, "the defendants"], appeal from: (1) the order granting summary judgment in favor of the plaintiffs-appellees SCI Management Corp., Hawaiian Memorial Park Cemetery, Hawaiian Memorial Life Plan, Ltd. dba Borthwick

---

* Associate Justice Ramil, who heard oral argument in this case, retired from the bench on December 30, 2002. See Hawai‘i Revised Statutes (HRS) § 602–10 (1993), which provides in relevant part that, "[a]fter oral argument of a case, if a vacancy arises ..., the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

Mortuaries, and Derek Kim [hereinafter, "the plaintiffs"], filed on July 25, 2001; (2) the final judgment, filed on July 25, 2001 in favor of the plaintiffs; (3) the order denying the defendants Harry Yee, Faye Kennedy, Jack Law, June Motokawa, and Allycyn Hikida–Tasaka's and the executive director's [hereinafter, collectively, "the HCRC defendants"] motion for reconsideration, filed on September 24, 2001; and (4) the order denying the HCRC defendants' motion to stay the circuit court's injunction, filed on September 24, 2001, all entered by the circuit court of the first circuit, the Honorable Dan T. Kochi presiding.

The complainants argue on appeal that the circuit court erred in: (1) granting summary judgment in favor of the plaintiffs, on the bases that (a) the plaintiffs had waived any right to a jury trial that they otherwise might have had by virtue of an arbitration clause contained in each complainant's employment contract with the plaintiffs, which required the parties to the contracts to arbitrate any employment disputes, including allegations of discrimination; and (b) Hawai'i Revised Statutes (HRS) § 368–12 (1993)[1] and Hawai'i Administrative Rules (HAR) Rule 12–46–20 (1993),[2] which provide a com-

plainant before the HCRC, but not a respondent, with the option of pursuing his or her claim in circuit court, do not, contrary to the circuit court's conclusion, violate a respondent's constitutional right to a jury trial as guaranteed by article I, section 13 of the Hawai'i Constitution;[3] and (2) granting plaintiffs injunctive relief—specifically, enjoining the proceedings before the HCRC involving the plaintiffs until such time as they are permitted to "opt out" of the proceedings—on the basis that injunctive relief is not available on a motion for summary judgment.

The HCRC defendants contend that the circuit court erred in granting summary judgment in favor of the plaintiffs, on the bases (1) that the right of a complainant to opt out of the HCRC process and proceed in circuit court under HRS § 368–12, *see supra* note 1, and HAR 12–46–20, *see supra* note 2, does not implicate the right to a jury trial pursuant to article I, section 13 of the Hawai'i Constitution, *see supra* note 3, nor permit similarly situated classes of persons unequal access to a jury trial and (2) that, even if it did, HRS chapter 368 does not violate the equal protection clause of the Hawai'i Constitution.[4]

1. HRS § 368–12 provides that:
   The [HCRC] may issue a notice of right to sue upon written request of the complainant. Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter. The [HCRC] may intervene in a civil action brought pursuant to this chapter if the case is of general importance.

2. HAR 12–46–20 provides in relevant part that:
   (b) A request, in writing, may be made to the executive director to issue a notice of right to sue:
   (1) At any time after the filing of a complaint with the [HCRC], and no later than three days after the conclusion of the scheduling conference provided for in section 12–46–19, by a complainant alleging violations of [HRS] chapters 368, 378, or 489 . . .;
   (2) At any time after the filing of a complaint with the [HCRC] but before a finding of reasonable cause under [HRS § ] 515–9(2) . . . by a complainant alleging violations of [HRS] chapter 515 . . .; or
   (3) Within twenty days after receipt of the notice of election to file a civil action under [HRS § ] 515–9(3) . . . by any party to a complaint alleging violations of [HRS] chapter 515. . . .

(c) The . . . executive director shall issue a notice of right to sue provided that the [HCRC] has not:
   (1) Previously issued a notice;
   (2) Entered into a conciliation agreement to which the complainant is a party; or
   (3) Filed a civil action.
   (d) The . . . executive director shall issue a notice of right to sue:
   (1) Upon dismissal of the complaint pursuant to section 12–46–11; or
   (2) Where the [HCRC] has entered into a conciliation agreement to which the complainant is not a party pursuant to section 12–46–15(d).

3. Article I, section 13 of the Hawai'i Constitution provides in relevant part that, "[i]n suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved."

4. Article I, section 5 of the Hawai'i Constitution provides that:

   No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exer-

The plaintiffs urge this court to affirm the judgment and orders of the circuit court on the following bases: (1) that the plaintiffs never waived their right to challenge the constitutionality of HRS chapter 368; (2) that the question whether the arbitration agreements between the plaintiffs and each of the complainants constituted a valid waiver of the plaintiffs' right to a jury trial was not properly before the circuit court; (3) that the defendants had argued below that the arbitration agreements were invalid and/or unenforceable; (4) that HRS chapter 368 violates article I, sections 5 and 13 of the Hawai'i Constitution, *see supra* notes 3 and 4; and (5) that the circuit court properly enjoined the proceedings before the HCRC in order to prevent the loss of the plaintiffs' constitutional right to a jury trial with respect to the complainants' common law damage claims that were pending before the HCRC.

For the reasons discussed *infra* in section III, we hold: (1) that the complainants are estopped from attempting to enforce any arbitration agreements in the circuit court; and (2) that the plaintiffs are not entitled to opt out of the proceedings before the HCRC; but (3) that, after the conclusion of the HCRC proceedings, the plaintiffs are entitled to a jury trial with respect to any common law damage claims for which they are found to be liable by the HCRC. Accordingly, we vacate the circuit court's orders and judgment and remand the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.. HRS Chapter 368

This appeal arises from a complaint filed in the HCRC by the complainants pursuant to HRS chapter 368 (1993 & Supp.1998). The legislature enacted HRS chapter 368 in 1988 in order to "provide a mechanism which provides for a uniform procedure for the enforcement of the State's discrimination laws." HRS § 368–1 (1993). The HCRC has "jurisdiction over the subject of discriminatory

cise thereof because of race, religion, sex or ancestry.

practices made unlawful by chapters 489, 515, part I of chapter 378, and ... chapter [368]. Any individual claiming to be aggrieved by an alleged unlawful discriminatory practice may file with the ... executive director a complaint in writing[.]" HRS § 368–11(a) (1993). The executive director is required to investigate the complaint and determine whether there is "reasonable cause to believe that chapter 489, 515, part I of 378, or ... chapter [368] has been violated." HRS § 368–13(a) (1993).[5] If the executive director determines that there is no reasonable cause, he or she shall promptly notify the parties in writing, and the complainant may bring a civil action. HRS § 368–13(c) (1993). On the other hand, if the executive director determines that there is reasonable cause, he or she shall "immediately endeavor to eliminate any alleged unlawful discriminatory practice by informal methods such as conference, conciliation, and persuasion." HRS § 368–13(d) (1993). If the executive director is unable to resolve the problem by informal means within one hundred eighty days of the filing of the complaint and the HCRC has not granted an extension of time, the executive director shall "demand that the respondent cease the unlawful discriminatory practice." HRS § 368–13(e) (1993). If the case is not settled within fifteen days after service of the executive director's demand, the HCRC shall "appoint a hearings examiner and schedule a contested case hearing that shall be held in accordance with [HRS] chapter 91." HRS § 368–14(a) (1993).

Following the completion of the contested case hearing, the hearings officer shall issue a proposed decision containing a statement of the reasons including a determination of each issue of fact or law necessary to the proposed decision which shall be served upon the parties.... If the [HCRC] finds that unlawful discrimination has occurred, the [HCRC] shall issue a decision and order in accordance with [HRS] chapter 91 requiring the respondent

**5.** HRS §§ 368–11(a) and 368–13(a) were amended in 2001 in respects not pertinent to the present appeal. *See* 2001 Haw. Sess. L. Act 55, §§ 17(2) and 17(4) at 92.

to cease the unlawful practice and to take appropriate remedial action. If there is no finding of discrimination, the [HCRC] shall issue an order dismissing the case.

*Id.* "The remedies ordered by the [HCRC] or the court under [HRS chapter 368] may include compensatory and punitive damages and legal and equitable relief[.]" HRS § 368–17(a) (1993).[6] The complainant and the respondent are each entitled to appeal the final order of the HCRC, *de novo,* based on the record of the proceedings before the HCRC, in the appropriate circuit court. HRS §§ 368–16(a) and 368–16(c) (1993).

Although HRS chapter 368 was intended to "provide[ ] for a uniform procedure for the enforcement of the State's discrimination laws[,][i]t [was also] the legislature's intent to preserve all existing rights and remedies under such laws." HRS § 368–1. Accordingly, the legislature authorized the HCRC to "issue a notice of right to sue upon written request of the complainant." HRS § 368–12 (1993). "The [HCRC] may intervene in a civil action brought pursuant to [HRS chapter 368] if the case is of general importance." *Id.*

B. *The Proceedings In The HCRC Based On The Complainants' Allegations Of Discrimination*

On January 20 and 22, 1998, respectively, Sims and Quinata filed complaints with the HCRC pursuant to HRS chapter 368, alleging, *inter alia,* that Derek Kim, an employee of SCI Management Corp., Hawaiian Memorial Park Cemetery, and Hawaiian Memorial Life Plan, Ltd. dba Borthwick Mortuaries, had sexually harassed them and that they had been subjected to retaliation because of their resistance to the alleged sexual harassment. The executive director investigated the complaints and, on January 24, 2000, informed the complainants that he had determined that there was reasonable cause to believe that Derek Kim had committed unlawful discriminatory practices against them and requested that the plaintiffs enter into informal discussions with the complainants in

order to settle the case. On July 5, 2000, after informal conciliation methods had failed, the executive director issued his final conciliation demand to the plaintiffs, in which the executive director insisted, *inter alia,* that the plaintiffs pay each of the complainants $400,000.00 as "alleged general damages, including but not limited to emotional distress." On August 3, 2000, the plaintiffs having failed to respond, a contested case hearing was scheduled for each complainant. Sims and Quinata subsequently intervened as parties in their respective cases and the cases were consolidated over the plaintiffs' objections on January 11, 2001.

On March 2, 2001, in a letter to the executive director, the plaintiffs demanded a jury trial as to all of the allegations raised by the complainants, pursuant to article I, section 13 of the Hawai'i Constitution, *see supra* note 3. The record does not reflect whether the executive director ever responded to the plaintiffs' request.

C. *The Plaintiffs' Prayer For Declaratory Relief In The Circuit Court*

On March 9, 2001, the plaintiffs filed a complaint in the present matter in the first circuit court seeking declaratory and injunctive relief. In Count I, the plaintiffs alleged that HRS chapter 368 violates article I, section 13 of the Hawai'i Constitution, *see supra* note 3, on the basis that it "does not contain a provision for a respondent to opt out of the HCRC [proceedings] and obtain a jury trial in [c]ircuit [c]ourt on the allegations of discrimination that have been alleged against it by a complainant." In Count II, the plaintiffs alleged that HRS chapter 368 violates article I, section 5 of the Hawai'i Constitution, *see supra* note 4, on the basis that the denial of a respondent's right to a jury trial denied a respondent due process of law. In Count III, the plaintiffs alleged that HRS chapter 368 denies respondents the equal protection of the laws, in violation of article I, section 5 of the Hawai'i Constitution, *see supra* note 4, because it affords complainants but not respondents the right to a jury trial.

---

6. In 2001, HRS § 368–17 was amended in respects not pertinent to the present appeal. *See*

2001 Haw. Sess. L. Act 55, § 17(5) at 92–93.

In Count IV, the plaintiffs prayed for an order staying the proceedings before the HCRC involving the complainants' allegations, *inter alia*, "until final adjudication of the [plaintiffs'] constitutional claims[.]" On April 12, 2001, the plaintiffs filed an amended complaint, which did not differ substantively from the initial complaint, to which the defendants Sims, Quinata, the executive director, and commissioners each filed answers.

Also on March 9, 2001, the plaintiffs moved for a preliminary injunction ordering the executive director to stay the consolidated cases involving the complainants that were pending before the HCRC. The circuit court denied the motion on June 13, 2001.

On June 5, 2001, the plaintiffs filed a motion for summary judgment as to all of the counts contained in their first amended complaint. On June 20, 2001, the defendants Sims, Quinata, the executive director, and commissioners, each filed a memorandum in opposition to the plaintiffs' motion. Sims argued, *inter alia*, that, based on the "public rights doctrine," respondents before the HCRC are not entitled to a jury trial. Quinata urged the circuit court not to reach the plaintiffs' constitutional claims on the basis that, regardless of the constitutionality of HRS chapter 368, there were genuine issues of material fact as to whether the plaintiffs had waived any right to a jury trial.[7] The executive director maintained that the plaintiffs had no fundamental right to a jury trial in administrative proceedings and were merely expressing their desire to select the forum of their choice. In addition, the executive director argued that the plaintiffs were required to exhaust their administrative remedies before they could even assert the right to a jury trial. The commissioners argued: (1) that, because the legislature had created a new statutory claim for relief, no constitutional right to a jury trial was implicated; (2) that the statutory scheme creating the HCRC did not infringe respondents' right to the equal protection of the laws, inasmuch as the scheme survived "rational basis" review; and (3) that the preponderance of the case law of foreign jurisdictions supported the proposition that there was no right to a jury trial in an administrative forum.

■ On July 15, 2001, the circuit court granted the plaintiffs' motion for summary judgment. The circuit court ruled: (1) that the public rights doctrine was inapplicable to HRS chapter 368 because the statutory framework provided for private remedies; (2) that, because HRS chapter 368 afforded complainants and respondents disparate access to a jury trial, thereby implicating a fundamental constitutional right, the state was subject to the burden of surviving "strict scrutiny" review; (3) that the state had failed to meet its burden of establishing that HRS chapter 368 survived strict scrutiny review; and (4) consequently, that HRS § 368–12, *see supra* note 1, and HAR 12–46–20, *see supra* note 2, violated article I, sections 5 and 13 of the Hawai'i Constitution, *see supra* notes 3 and 4, and the fourteenth amendment to the United States Constitution.[8] Accordingly, the circuit court enjoined the HCRC "from any further proceedings in the cases involving [the plaintiffs] until [the plaintiffs are] given a right to opt out of the HCRC administrative proceedings and seek a jury trial in the [c]ircuit [c]ourt on the common law damage claims alleged in the HCRC docketed cases." The circuit court limited its ruling to the parties in the present matter and specifically did not prohibit the HCRC from "continuing its activities with respect to other claims brought by complainants before the HCRC."

---

7.  Quinata contended that her employment agreement mandated that all disputes be resolved by binding arbitration, subject to the prerogative of employees to file complaints with the Equal Employment Opportunity Commission (EEOC) or similar state agency.

8.  It is not clear why the circuit court ruled that HRS chapter 368 violated the plaintiffs' rights under the fourteenth amendment to the United States Constitution, inasmuch as the plaintiffs did not challenge the statute on the foregoing grounds. Accordingly, we need not decide whether any provisions of HRS chapter 368 violate the fourteenth amendment to the United States Constitution in the present appeal. *See Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 371, 833 P.2d 70, 77 (1992) ("The general rule in this jurisdiction is that we will not address a legal theory not raised by the appellant in the court below.").

On August 6, 2001, the HCRC defendants filed motions to stay the circuit court's injunction and for reconsideration. On September 24, 2001, the circuit court denied both motions. On August 20, 2001, the complainants filed a joint notice of appeal. On August 23, 2001, the HCRC defendants filed a notice of appeal, which they amended to a joint notice on October 3, 2001.

## II.  STANDARDS OF REVIEW

### A.  Motion For Summary Judgment

■ We review the circuit court's grant or denial of summary judgment *de novo*. *Hawai'i Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Coon v. City and County of Honolulu*, 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002).

### B.  Constitutional Law

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case.... Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points in original omitted).

## III.  DISCUSSION

### A.  The Arbitration Clauses Contained In The Complainants' Employment Contracts Do Not Foreclose The Plaintiffs' Constitutional Challenge To HRS Chapter 368.

■ As a preliminary matter, we address the complainants' argument, in which the HCRC does not join, that the circuit court erred in addressing the plaintiffs' constitutional challenge to HRS chapter 368 because, assuming *arguendo* that a respondent employer in an HCRC proceeding has a constitutional right to a jury trial, the plaintiffs in the present matter waived the right with respect to the resolution of any employment disputes with the complainants. The complainants maintain that an arbitration clause contained within each of their employment contracts, which required the parties to the contracts to arbitrate any employment disputes, including allegations of discrimination, constituted a waiver by the plaintiffs of any right to a jury trial. We disagree.

■ We are unable to discern how an agreement to arbitrate employment disputes abrogates whatever right to a jury trial an employer may have if an employee, who is a party to the agreement, files a complaint with the HCRC and seeks legal rather than equitable forms of relief. There is no dispute that none of the parties attempted to enforce the arbitration agreements in the proceedings before the HCRC. Indeed, the complainants unilaterally filed complaints with the HCRC rather than seeking to resolve their dispute by means of arbitration and eventually intervened as parties in the HCRC proceedings. Thus, the complainants would have this court hold that the arbitration clauses abrogated whatever right the plaintiffs had to a jury trial despite the fact that the complainants themselves sought to avoid the terms of the arbitration agreement. It is well-settled, however, that "a party is precluded from asserting to another's disadvantage[ ] a right inconsistent with a position previously taken by him." *Maria v. Freitas*, 73 Haw. 266, 274, 832 P.2d 259, 264 (1992)

(quoting *Aehegma v. Aehegma*, 8 Haw.App. 215, 224, 797 P.2d 74, 80 (1990) (quoting *Hartmann v. Bertelmann*, 39 Haw. 619, 628 (1952) (quoting *Montclair Trust Co. v. Russell Co.*, 135 N.J. Eq. 570, 39 A.2d 641, 643 (N.J.Ch.1944)))) (internal quotation signals omitted); *see also Roxas v. Marcos*, 89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1999) ("A party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action.") (Quoting *Rosa v. CWJ Contractors, Ltd.*, 4 Haw.App. 210, 218, 664 P.2d 745, 751 (1983).) (Brackets omitted.). Accordingly, we hold that the complainants are judicially estopped from attempting to enforce their arbitration agreements in the circuit court.

B. *The Plaintiffs Are Entitled To A Jury Trial On Any Common Law Damage Claims For Which They Are Found To Be Liable By The HCRC, But Only After The Conclusion Of The HCRC Proceedings.*

■ As noted *supra* in note 3, article I, section 13 of the Hawai'i Constitution preserves the right to a trial by jury "[i]n suits at common law where the value in controversy shall exceed five thousand dollars. . . ." This court has explained that article I, section 13 preserves the right to a jury trial that "existed under the common law of this state at the time that the Hawai'i Constitution went into effect in 1959." *Housing Fin. and Dev. Corp. v. Ferguson*, 91 Hawai'i 81, 87, 979 P.2d 1107, 1113 (1999) (citations omitted). "[I]n the case of statutory actions without direct common-law antecedents," this court has applied "a simplified test focusing solely on whether the nature of the remedy sought is 'legal' or 'equitable.'" *Id.* at 88, 979 P.2d at 1114 (citing *Mehau v. Reed*, 76 Hawai'i 101, 110–11, 869 P.2d 1320, 1329–30 (1994) ("The test to determine whether a suit is 'at common law' is not whether the cause of action is statutory, but whether the cause of

action seeks 'legal' or 'equitable' relief"); *cf. Curtis v. Loether*, 415 U.S. 189, 193–94, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) ("Although the thrust of the [seventh a]mendment [to the United States Constitution] was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common-law forms of action recognized at that time. . . . By *common law*, [the Framers of the Amendment] meant . . . not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered. . . . The [s]eventh [a]mendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies enforceable in an action for damages in the ordinary courts of law.") (Citations and internal quotation signals omitted.) (Emphasis in original.) (Some ellipsis points added and some in original.)). Traditional forms of "legal" relief include compensatory and punitive damages. *See Mehau*, 76 Hawai'i at 110, 869 P.2d at 1329 (noting that plaintiff who sought monetary damages based upon invasion of privacy sought legal, rather than equitable, relief); *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc.*, 76 Hawai'i 454, 463, 879 P.2d 1037, 1046 (1994) (noting that compensatory and punitive damages are traditional legal remedies).

■ HRS § 368–17(a) (1993) provided that "[t]he remedies ordered by the [HCRC] or the court under [HRS chapter 368] may include compensatory and punitive damages and legal and equitable relief, including, but not limited to . . . . [p]ayment to the complainant of damages for an injury or loss caused by a violation of [HRS] chapters [368,] 489, 515, [or] part I of chapter 378, . . . including a reasonable attorney's fee . . . [and] [other] relief [that] the [HCRC] or the court deems appropriate."[9] Thus, by its plain language, HRS chapter 368 empowers the HCRC to award legal forms of relief.

9. HRS § 368–17, as amended in 2001, *see supra* note 6, does not differ in any material respects from the foregoing.

Moreover, in the proceedings before the HCRC from which the present matter arises, the complainants and the executive director claim legal relief in the form of monetary damages—*i.e.*, $400,000.00 in "alleged general damages, including but not limited to emotional distress"—for each complainant. Consequently, we agree with the plaintiffs that they are entitled to a jury trial with respect to the complainants' allegations of sexual discrimination and retaliation.

■ The defendants do not deny that they claim, *inter alia*, legal forms of relief or even that such claims ordinarily trigger the right to a jury trial pursuant to article 1, section 13 of the Hawai'i Constitution. Rather, the defendants urge us to adopt the "public rights doctrine" articulated by the United States Supreme Court with respect to the seventh amendment to the United States Constitution, which, the defendants contend, "establishes that a jury trial is not available as a matter of right in cases where the legislature has established an administrative agency to oversee and rule on the action." Although the seventh amendment is not applicable to the states, *see Minneapolis & St. Louis R.R. Co. v. Bombolis*, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916), "[b]ecause article I, section 13 was patterned after the seventh amendment to the United States Constitution, 'we have deemed the interpretation of [the seventh amendment] by the federal courts highly persuasive in construing the right to a civil jury trial in Hawai'i.'" *Housing Fin. and Dev. Corp.*, 91 Hawai'i at 87, 979 P.2d at 1113 (quoting *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 513, 880 P.2d 169, 188 (1994) (citing *Harada v. Burns*, 50 Haw. 528, 532 & n. 1, 445 P.2d 376, 380 & n. 1 (1968))) (some brackets added and some in original). We need not reach the question whether Hawai'i should adopt the "public rights" doctrine, however, because, even if we were to hold that our state legislature, in certain cases, may abrogate a party's right to a jury trial, the doctrine would not assist the defendants in the present matter.

■ Pursuant to the "public rights" doctrine, Congress may assign the adjudication of "new statutory 'public rights'" to a tribu-

nal that does not employ juries as fact-finders, "without violating the [s]eventh [a]mendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (quoting *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 455, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977)). "Public rights," as defined by the United States Supreme Court, are statutory causes of action (1) that "inhere[ ] in, or lie[ ] against, the Federal Government in its sovereign capacity" or (2) that are "'so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.'" *Id.* at 53–54, 109 S.Ct. 2782 (citing *Atlas Roofing*, 430 U.S. at 458, 97 S.Ct. 1261, and quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593–94, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). "Public rights" are distinguishable from "private rights," which concern "'the liability of one individual to another under the law as defined[.]'" *Id.* at 51 n. 8, 109 S.Ct. 2782 (quoting *Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). *See also In re MCI Telecommunications Corp. Complaint*, 240 Mich.App. 292, 612 N.W.2d 826, 836 (2000) (recognizing that the Michigan Constitution does not require adjudication by a jury where "the statutory right is so closely integrated into a public regulatory scheme as to be appropriate for resolution by an administrative agency"); *Lisanti v. Alamo Title Ins. of Texas*, 132 N.M. 750, 55 P.3d 962, 967 (2002) (recognizing "public rights" to include rights vis-a-vis the state and rights that are "'closely intertwined' with a regulatory program"); *FUD's, Inc. et al. v. State*, 727 A.2d 692, 698 (R.I. 1999) (recognizing "public rights" under the Rhode Island Constitution to "include those 'statutory rights that are integral parts of a public regulatory scheme and whose adjudication [the legislature] has assigned to an administrative agency or specialized court of equity'" (brackets in original) (quoting *National Velour Corp. v. Durfee*, 637 A.2d 375, 379 (R.I.1994) (quoting *Granfinanciera*, 492 U.S. at 55 n. 10, 109 S.Ct. 2782))); *National Velour Corp.*, 637 A.2d at 379 (adopting "the

public-rights doctrine developed by the United States Supreme Court in instances wherein the Legislature has assigned adjudication of civil penalties to an administrative agency"); *Bishop Coal Co. v. Salyers,* 181 W.Va. 71, 380 S.E.2d 238, 245 (1989) ("When an individual acts to enforce 'public rights' and, as a minor part of such enforcement is awarded 'incidental' damages, a jury trial is not required. However, when an individual seeks substantial money damages as compensation for pain and suffering, the individual's role in enforcement of the 'public rights' is minor and the narrow exception to the requirement of a jury trial does not apply.").

Notwithstanding its embrace of the "public rights" doctrine, the Supreme Court cautioned in *Granfinanciera* that Congress

> lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury. As we recognized in *Atlas Roofing,* to hold otherwise would be to permit Congress to eviscerate the [s]eventh [a]mendment's guarantee by assigning to administrative agencies or courts of equity all causes of action not grounded in state law, whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears. 430 U.S. at 457–458 [97 S.Ct. 1261] . . . .
>
> The Constitution nowhere grants Congress such puissant authority. "[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity," *Ross v. Bernhard,* 396 U.S. 531, 538 [90 S.Ct. 733, 24 L.Ed.2d 729] . . . (1970), nor can Congress conjure away the [s]eventh [a]mendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal.

*Granfinanciera,* 492 U.S. at 51–52, 109 S.Ct. 2782 (footnote and some citations omitted) (some brackets added and some in original); *accord Atlas Roofing,* 430 U.S. at 458, 97 S.Ct. 1261 (cautioning that Supreme Court case law "support[s] administrative factfinding in only those situations involving 'public rights[';] . . . . [w]holly private tort, contract, and property cases, as well as a vast range of other cases as well are not at all implicated").

Accordingly, in *Granfinanciera,* the United States Supreme Court held that "a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer[,] . . . . notwithstanding Congress' designation of fraudulent conveyance actions" as triable by bankruptcy judges without a jury. *Id.* at 36, 109 S.Ct. 2782. First, the Court determined that fraudulent conveyance actions by bankruptcy trustees "constitute no part of the proceedings in bankruptcy but concern controversies arising out of it" and "are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res . . . . They therefore appear [to be] matters of private rather than public right." *Id.* at 56, 109 S.Ct. 2782 (citations and internal quotation signals omitted). Second, the Court concluded that such actions are not "integrally related to the reformation of debtor-creditor relations"—*i.e.,* the public regulatory scheme upon which the trustee sought to justify the adjudication of the action without a jury. *Id.* at 60, 109 S.Ct. 2782. In this regard, the Court noted that permitting jury trials in fraudulent conveyance actions brought by a trustee would not " 'go far to dismantle the statutory scheme,' " nor " 'be incompatible' with bankruptcy proceedings, in view of Congress' express provision for jury trials in certain actions arising out of bankruptcy litigation." *Id.* at 61–62, 109 S.Ct. 2782 (quoting *Atlas Roofing,* 430 U.S. at 450, 454, 97 S.Ct. 1261). Although the *Granfinanciera* Court acknowledged that "providing jury trials in some fraudulent conveyance actions . . . would impede swift resolution of bankruptcy proceedings and increase the expense of Chapter 11 reorganizations[,]" it concluded that "these considerations are insufficient to overcome the clear command of the [s]eventh [a]mendment." *Id.* at 63–64, 109 S.Ct. 2782 (footnotes and citations omitted).

In *Atlas Roofing,* by contrast, the United States Supreme Court held that the Occupa-

tional Safety and Health Act of 1970 (OSHA), which permits the federal government, "proceeding before an administrative agency, (1) to obtain abatement orders requiring employers to correct unsafe working conditions and (2) to impose civil penalties on any employer maintaining any unsafe working condition[,]" did not violate employers' seventh amendment rights. *Id.* at 445, 460–61, 97 S.Ct. 1261. The Court noted, *inter alia*, that

> Congress found the common-law and other existing remedies for work injuries resulting from unsafe working conditions to be inadequate to protect the Nation's working men and women. It created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved. The [s]eventh [a]mendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law.

*Id.* at 461, 97 S.Ct. 1261.

In the present matter, plaintiffs argue that they are entitled to a jury trial with respect to the complainants' allegations of sexual harassment and retaliation. In the proceeding before the HCRC, the executive director seeks, *inter alia*, $400,000.00 "in alleged general damages, including but not limited to emotional distress," payable to each complainant, based on the allegations of sexual harassment and retaliation contained in their complaints, and the complainants have intervened as parties in the proceeding in order to protect their interests. Thus, although the state is a party to the proceedings before the HCRC and, in addition to requesting monetary relief on behalf of the complainants, undertakes to protect Hawai'i's working men and women from discrimination, the proceedings before the HCRC involve the adjudication of " 'the liability of one individual to another under the law as defined' " and do not merely arise " 'between the [state] and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative de-

partments.' " *Granfinanciera*, 492 U.S. at 51 n. 8, 109 S.Ct. 2782 (quoting *Crowell*, 285 U.S. at 50–51, 52 S.Ct. 285). Although we recognize that there may be circumstances in which individual relief furthers a public purpose, *see, e.g., Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 290–96, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (holding that the Equal Employment Opportunity Commission's (EEOC) pursuit of entirely victim-specific relief may vindicate a public interest), under HRS chapter 368, the adjudication of private rights has clear primacy over the adjudication of public rights, as demonstrated, *inter alia*, by the complainants' right, pursuant to HRS § 368–12 and HAR 12–46–20, *see supra* notes 1 and 2, to choose whether to pursue their claims before the HCRC or in the circuit court, where the right to jury trial is available to them.[10] *Cf. Waffle House, Inc.*, 534 U.S. at 291–92, 295, 122 S.Ct. 754 (noting that, pursuant to Title VII of the Civil Rights Act of 1964, the EEOC, rather than the employee, is "in command of the process" and "the employee has no independent cause of action" if the EEOC files suit on its own"); *FUD's, Inc.*, 727 A.2d at 698 (recognizing that, "[a]lthough the [Rhode Island Commission for Human Rights's] ability to order an employer to reinstate with back pay an employee who has suffered job discrimination ... directly 'foster[s] the employment of individuals in this state,' the [C]ommission's ability to order a private employer to compensate a former employee for his or her pain and suffering and—in cases involving malice, ill will, or reckless or callous indifference—to award punitive damages, ... more closely resembles the adjudication of a tort dispute between two private parties" (some brackets added and some in original)). *See also Dalis v. Buyer Advertising, Inc.*, 418 Mass. 220, 636 N.E.2d 212, 214–15 (1994) (noting that a sex discrimination claim is "a suit between two persons which clearly sets forth a controversy concerning property" and

---

10. During oral argument before this court, the HCRC defendants acknowledged that HRS § 368–12 gives complainants control over the prosecution of their claims by affording them the option of pursuing them in the circuit court or before the HCRC, depending on their needs and means.

is "analogous to common law actions sounding in both tort and contract").

Moreover, we do not believe that the involvement of a jury in the adjudication of an employer's liability to an employee for damages is incompatible with the statutory framework enacted by the legislature. Indeed, HRS § 368–12 authorizes the HCRC to "issue a notice of right to sue upon written request of the complainant"—*i.e.*, complainants are permitted to opt out of the HCRC proceedings and obtain a jury trial—and the HCRC may "intervene in a civil action brought pursuant to [HRS chapter 368] if the case is of general importance"—*i.e.*, the statute authorizes the HCRC to enforce public rights by means of a jury trial in circuit court. Thus, HRS chapter 368 is not a statute in which the legislature has "create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the ... judiciary." *Granfinanciera*, 492 U.S. at 54, 109 S.Ct. 2782. *Compare FUD's, Inc.*, 727 A.2d at 698 (holding that rights under Rhode Island's Fair Employment Practices Act (FEPA) are not public rights, because, "[a]lthough the right of employees to be free from employment discrimination is indeed 'statutory' and its 'adjudication has [been] assigned to an administrative agency,' their right to sue employers and to obtain compensatory and/or punitive damages for any violation of their rights to be free from employment discrimination falls more on the side of a traditional private remedy for legal wrongdoing than it does on the side of constituting an integral component of a public regulatory scheme"); *Lisanti*, 55 P.3d at 963 (holding that "a regulation which requires that all title insurance claims under $1,000,000 be resolved through arbitration" violates the right to a jury trial guaranteed by the New Mexico Constitution); *Bishop Coal Co.*, 380 S.E.2d at 246 ("[a]llowing the [West Virginia Human Rights Commission] to award money other than limited incidental damages, without a jury, would violate" the right to a jury trial under the West Virginia Constitution), *with Atlas Roofing*, 430 U.S. at 460–61, 97 S.Ct. 1261 (holding that a jury trial was not necessary for the adjudication of actions brought by the government to "correct unsafe working conditions" and to "impose civil penalties on any employer maintaining any unsafe working condition"); *Cavallari v. Office of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir.1995) (holding that an action brought by a government agency to enforce an order issued by the agency pursuant to its regulatory authority did not require a jury trial); *Pel–Star Energy, Inc. v. United States Dep't of Energy*, 890 F.Supp. 532, 541 (W.D.La. 1995) (holding that an action brought by a government authority to seek restitution for charges in excess to those set by law did not require a jury trial); *In re MCI Telecommunications Corp. Complaint*, 612 N.W.2d at 836 (holding that an action brought by a government agency to enforce an order issued by the agency pursuant to its regulatory authority did not require a jury trial); *National Velour Corp.*, 637 A.2d at 380 (holding that an environmental-enforcement action seeking civil penalties for violations of Rhode Island's Clean Air Act brought by the state agency entrusted with the act's enforcement "clearly involves a public right[,]" because "[t]he state was a party to the action to enforce a statutory right that is part of a pervasive regulatory scheme").

The defendants maintain that prohibiting respondent-employers but not complainants from "opting out" of proceeding before the HCRC (and, consequently, affording complainants but not respondent-employers the means of obtaining a jury trial) "helps balance the economic and social barriers faced by many civil rights complainants[ ]" and "takes into account the functions and limited resources of the HCRC, which lacks both the means and statutory authority to prosecute all claims of employment discrimination on behalf of complainants if respondents were given the ability to opt-out of administrative proceedings." Even if the defendants' unsubstantiated assumptions were correct, however, such pecuniary concerns cannot in and of themselves abrogate a party's fundamental right to a jury trial. *See Granfinanciera*, 492 U.S. at 63–64, 109 S.Ct. 2782 (noting that the expense and time of "providing jury trials in some fraudulent conveyance actions" are "insufficient to over-

come the clear command of the [s]eventh [a]mendment"); *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution"); *Germain v. Connecticut Nat'l Bank*, 988 F.2d 1323, 1332 (2d Cir.1993) ("Although it may be more expeditious to eschew a separate jury trial, such concerns have little weight when balanced against a constitutional guarantee."); *see also Lavelle v. Massachusetts Comm'n Against Discrimination*, 426 Mass. 332, 688 N.E.2d 1331, 1335 (1997) ("If one side to a dispute has a constitutional right to a jury trial, generally the other side must have a similar right. We are dealing here with a fundamental right ... and differing treatment of complainants and respondents in respect to the availability of that fundamental right ... cannot be justified."). If the legislature wishes to provide employees with greater assistance in prosecuting claims of employment discrimination, there is a variety of ways in which it may do so without divesting employers of the constitutional right to trial by jury. .

In sum, and to reiterate, we hold that, as HRS chapter 368 is currently written, a respondent before the HCRC is entitled to a jury trial with respect to claims that seek traditional forms of legal relief, including compensatory and punitive damages, on behalf of complainants before the HCRC.[11] Accordingly, we further hold that, in the present matter, the plaintiffs are entitled to a jury trial with respect to the executive director's demand for $400,000.00 in general damages, payable to each of the complainants, based on the complainants' allegations of sex discrimination and retaliation.

▆▆▆▆▆ The foregoing does not require us to hold, however, that the plaintiffs are

entitled to "opt out" of the proceedings before the HCRC.

Although trial by jury in civil cases is a "fundamental" right in the State of Hawai'i, *see Lee Wing Chau v. Nagai*, 44 Haw. 290, 293–94, 353 P.2d 998, 1000 (1960)[,] the right has never been construed so broadly as to prohibit reasonable conditions upon its exercise....

Moreover, in holding that a procedure for non-judicial determinations prior to jury trial does not violate the seventh amendment, the United States Supreme Court has stated that the seventh amendment "does not prescribe at what stage of an action a trial by jury must, if demanded, be had; or what conditions may be imposed upon the demand of such a trial, consistently with preserving the right to it." [*Kimbrough v. Holiday Inn*, 478 F.Supp. 566,] 569 [ (E.D.Pa.1979) ] (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 23 [19 S.Ct. 580, 43 L.Ed. 873] ... (1899)). Thus, with regard to mandatory arbitration programs that afford a right to trial *de novo*, it has been held that

[t]he only purpose of the [seventh amendment] is to secure the right of trial by jury before rights of person or property are *finally* determined. All that is required is that the right of appeal for the purpose of presenting the issue to a jury must not be burdened by the imposition of onerous conditions, restrictions or regulations which would make the right practically unavailable.

*Id.* ... at 570 (quoting *Application of Smith*, ... [381 Pa. 223] 112 A.2d 625 ( [Pa.]1955)[,] *appeal dismissed sub nom., Smith v. Wissler*, 350 U.S. 858 [76 S.Ct. 105, 100 L.Ed. 762] ... (1958) [ (1955) ]) (emphasis in original).

Thus, laws, practices, and procedures affecting the right to trial by jury under article I, § 13 are valid as long as they do

---

11. In so holding, we do not speculate as to whether a statutory scheme that prohibited both complainants and respondents from opting out of the proceedings before the HCRC would violate article I, section 13 of the Hawai'i Constitution. Such a statutory scheme would raise somewhat different constitutional questions, inasmuch as the complainant would not control the means of

prosecution of his or her claim, and jury trial would not, in some cases, constitute an integral part of the regulatory regime. *See, e.g., Lavelle*, 688 N.E.2d at 1336 (suggesting authority that might support the elimination of both a complainant's and a respondent's right to a jury trial in discrimination suits).

not significantly burden or impair the right to ultimately have a jury determine issues of fact.

*Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 513, 880 P.2d 169, 188 (1994) (footnote omitted) (some brackets added and some in original); *accord Lavelle,* 688 N.E.2d at 1335–36 ("differences in the treatment of complainants and respondents are permissible provided fundamental rights are not jeopardized"). Moreover, for this court to rewrite HRS chapter 368 in order to permit respondents as well as complainants to "opt out" of the HCRC proceedings would be contrary to the clear intent of the legislature as articulated in the plain language of the statute and, in many cases, unnecessary. The plaintiffs themselves concede that, if the HCRC were merely to conclude that a respondent is subject only to equitable remedies, such as back pay and injunctive relief, respondents before the HCRC would have no right to a jury trial pursuant to article I, section 13 of the Hawai'i Constitution. Likewise, "it would be contrary to the purpose of the statute for us to declare ... complainant[s'] claim[s] unenforceable because the statutory scheme does not grant [respondents] a right to seek a trial by jury" in cases in which legal remedies are awarded. *Lavelle,* 688 N.E.2d at 1335.

Thus, we adopt the solution fashioned by the Massachusetts Supreme Judicial Court in addressing a similar statutory scheme in *Lavelle,* which permits a respondent before the Massachusetts Commission Against Discrimination to avail himself or herself of a jury trial "on any of the complainant's claims that, after final agency action, has resulted in the granting of relief that departs from or exceeds the relief that a court of equity could traditionally have granted." *Lavelle,* 688 N.E.2d at 1337. Therefore, we hold that a respondent who appeals a final order of the HCRC, pursuant to HRS § 368–16, is entitled to a jury trial on any claims that form the basis for an award of common law damages by the HCRC.[12]

We believe that the foregoing holding is the best means of curing the constitutional defect contained in HRS chapter 368 for a number of reasons. First and foremost, it does not require this court either to hold that HRS chapter 368 is unconstitutional or to rewrite it. In this connection, we note that central to Justice Acoba's dissent is the subtext that the only option available to this court in the event that HRS chapter 368 is deemed to be in conflict with the fundamental constitutional right to a jury trial with respect to common law claims is to strike down the statute in its entirety. We believe that such a drastic course is unnecessary when we can simply follow the persuasive

---

**12.** Like the petition for appellate review of an HCRC order pursuant to HRS § 368–16, the respondent must file his or her request for a jury trial "not more than thirty days after a copy of the [final] order of the [HCRC] is received," HRS § 368–16(e); otherwise, the respondent waives his or her right to a jury trial. By electing to seek a jury trial, however, the respondent waives his or her right to appellate review of the HCRC's final order in the circuit court, and the whole action is tried *de novo* in the circuit court. *Cf. Kaulia v. Honolulu Rapid Transit Co., Ltd.,* 32 Haw. 446, 448 (1932) (reading the Workmen's Compensation Act of 1925 to permit an employee to elect either to pursue his or her claim under the statute or under the common law, but not both); *Parr v. United States,* 172 F.2d 462, 463–64 (10th Cir.1949) (noting that where appellant had "two remedies, each for the same wrong, and both against the United States[,] .... [e]ffectively invoking one constituted an election which precluded resort to the other"). Where an action involves claims for both legal and equitable relief, "the right to jury trial on the legal claim, including all issues common to both claims, re-

mains intact. The right cannot be abridged by characterizing the legal claim as 'incidental' to the equitable relief sought." *Curtis,* 415 U.S. at 196 n. 11, 94 S.Ct. 1005; *accord Lytle v. Household Manufacturing, Inc.,* 494 U.S. 545, 550, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Tull v. United States,* 481 U.S. 412, 425, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Moreover, "the trial court is precluded from ruling, in the first instance, on any equitable claims that may determine the outcome of the legal claims." *Lee v. Aiu,* 85 Hawai'i 19, 29, 936 P.2d 655, 665 (1997) (citing *Harada v. Burns,* 50 Haw. 528, 445 P.2d 376 (1968)). "'[W]hen a jury is called upon to make findings in connection with both legal and equitable matters resting upon the same set of facts, the trial court is bound by the jury's findings of fact when making its equitable determinations." *Id.* (citations omitted). *Cf. Mathewson v. Aloha Airlines, Inc.,* 82 Hawai'i 57, 79 n. 22, 919 P.2d 969, 991 n. 22 (1996) ("in a jury trial of an action seeking equitable and legal remedies, the jury decides legal questions and awards legal damages and the court decides equitable questions and awards equitable relief").

example of the Massachusetts high court, in *Lavelle,* by harmonizing the imperatives of article I, section 13 of the Hawai'i Constitution and the statutory framework created by the legislature in HRS chapter 368.

But in addition,

[m]any disputes will be settled by the [executive director] and will not need to be adjudicated. Persons representing themselves will not be forced into unfamiliar court surroundings but will be heard instead in less intimidating [HCRC] proceedings. Courts, in turn, will not be unnecessarily inundated with ... discrimination lawsuits demanded by respondents, perhaps in some instances for tactical reasons. Also, the [HCRC] may decide in favor of the respondent on the merits.... Moreover, although the [HCRC] may decide in favor of the complainant, it might only grant traditional equitable relief. In such a case, a respondent would have no right to a jury trial. Additionally, an unsuccessful respondent may conclude that an appeal based on the [HCRC] record ... provides an adequate avenue of relief from the agency decision. We adopt this solution recognizing that it gives certain respondents two chances to prevail, before the [HCRC] and then in [circuit] court, while a complainant unsuccessful before the [HCRC] may not proceed to court for a new hearing ..., but may seek judicial review only on the agency record....

Any other solution[, however,] must be left to the Legislature.

*Id.* at 1336 (citations omitted).

Finally, because the foregoing holding disposes of the present appeal, we decline to address the remaining arguments advanced by the parties.

## IV.   *CONCLUSION*

In light of the foregoing, we vacate the circuit court's orders and judgment and remand the matter for further proceedings consistent with this opinion.

1.   HRS § 368-12 reads:
   **Notice of right to sue.** The [HCRC] may issue a notice of right to sue upon written

Dissenting opinion by ACOBA, J.

I respectfully disagree that this court may refashion the statutory framework of Hawai'i Revised Statutes (HRS) chapter 368 by directing that an employer who appeals a final order of the Hawai'i Civil Rights Commission (HCRC or commission) is entitled to a jury trial. *See* majority opinion at 452, 71 P.3d at 403. In doing so, the majority subverts the entire statutory framework for disposition of civil rights claims, an action that will have a domino effect in the law.

The disposition the majority renders is not a judicial decision, but a legislative act. The majority does not construe legal language, fill in the interstices of the law, *see Southern Pac. Co. v. Jensen,* 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting) (noting that "judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions"), or fashion a traditional judicial remedy. It prescribes, without any legal antecedent or inherent power, *see State v. Augafa,* 92 Hawai'i 454, 470, 992 P.2d 723, 740 (App.1999), what are in effect statutory amendments to HRS § 368-16 (1993). *See* majority opinion at 452 n. 12, 71 P.3d at 403 n. 12. It thus exceeds the boundaries of judicial power, encroaches upon legislative and executive prerogatives, and violates the principle of separation of powers that guarantees to the people that no branch of government will arrogate to itself those functions and powers vested by the constitution in the other branches. The conciliation and compromise necessary in the resolution of public policy issues falls clearly within the primary venue of the legislative and executive branches. We, however, must decide the questions as they are presented to us. In effect, in circumventing the legal questions raised by the parties in this appeal, the majority fails to exercise and, thus, diminishes our power of judicial review.

Facing the questions raised on appeal, I would hold that HRS § 368-12 (1993),[1] which

request of *the complainant.* Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under

permits an employee who brings a discrimination complaint to the commission to request removal of the case to court, satisfies strict scrutiny and therefore also rational basis review and, thus, is not in violation of the equal protection clause of the Hawai'i State Constitution. Under rational basis review, HRS § 368–12 furthers a legitimate government interest in preventing discrimination. Under a strict scrutiny analysis, HRS § 368–12 unquestionably satisfies a compelling state interest in that respect, and is narrowly-tailored to that purpose. Because there is no equal protection violation, HRS chapter 368 does not infringe on an employer's right to a jury trial under article I, section 13 of our State constitution. Accordingly, I would vacate the contrary judgment of the first circuit court. Prior to his retirement, Justice Mario Ramil, who heard oral argument in this case, expressed his joinder with this position.

Finally, while not central to my position, I do not concur with the majority's narrow view of the public rights doctrine.[2]

## I.

The majority adopts the proposition that a respondent employer (employer) may appeal a final order from the HCRC adverse to it and "is entitled to a [*de novo*] jury trial on

any claims that form the basis for an award of common law damages by the HCRC." Majority opinion at 452, 71 P.3d at 403. Several deleterious effects on the policy and procedure of HRS chapter 368 follow from this proposition.

First, under the majority's decision, only an employer is entitled to a second trial if it is unsuccessful in the administrative process now in effect. Thus the majority's decision grants to the employer a second proverbial bite at the apple not afforded to an employee. HRS § 368–16(a) presently states that *both* a "complainant and a[n employer] shall have a right to appeal from a final order of the commission[.]" Obviously, the provision does not provide that one party as opposed to another is entitled to a new proceeding if dissatisfied with the commission's decision.

Second, as in court trials, the purpose of having a single dispositive administrative proceeding as allowed under HRS chapter 368 is to compel the parties to "take the first trial seriously" and to protect "a victorious party against oppression by a wealthy, wishful, or even paranoid adversary." C. Wright, A. Miller, and E. Cooper, 18 *Federal Practice and Procedure: Jurisdiction and Related Matters*, § 4403, at 14 (1981) [hereinafter, *Federal Practice*]. Because, under the majority's rule, the outcome before the commission is always potentially subject to a retrial

---

this chapter. The commission may intervene in a civil action brought pursuant to this chapter if the case is of general importance. (Boldfaced font in original.) (Emphasis added.) Nothing in chapter 368 allows a respondent to request and to receive a notice of right to sue.

**2.** No party raises the question of whether a mandatory arbitration agreement concerning discrimination claims such as that in this case contravenes HRS chapter 368. Our current case law appears to support the proposition that a valid arbitration agreement waives all statutory and constitutional rights. *See Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 921 P.2d 146, *reconsideration denied*, 82 Hawai'i 360, 922 P.2d 973 (1996).

However it is expressly stated that the purpose of chapter 368 is "to provide a mechanism which provides for a *uniform* procedure for the enforcement of the State's discrimination laws." HRS § 368–1 (1993) (emphasis added). The chapter is inclusive, "preserv[ing] *all* existing rights and remedies under such laws." *Id.* (emphasis added). Thus, an arbitration award rendered out-

side of HRS chapter 368 may arguably violate the public policy establishing HRS chapter 368 as the procedure for deciding discrimination cases. *See Inlandboatmen's Union v. Sause Bros., Inc.*, 77 Hawai'i 187, 194, 881 P.2d 1255, 1262 (App.1994); *cf. Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir.2003) (concluding that an arbitration "agreement is wholly unenforceable" as to an employment discrimination claim as the agreement is "unconscionable under California contract law"); *Swenson v. Management Recruiters Int'l, Inc.*, 872 F.2d 264, 266 (8th Cir.1989) (recognizing that "any arbitration award regarding a discrimination claim could not be enforced since it would be against public policy"); *Swenson v. Management Recruiters Int'l, Inc.*, 858 F.2d 1304, 1307 (8th Cir.1988) (noting that "arbitration is unable to pay sufficient attention to the transcendent public interest in the enforcement of Title VII"); *but see Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that a mandatory arbitration agreement is valid for claims under the Age Discrimination in Employment Act).

at the employer's behest, the administrative hearing before the commission, *see* HRS § 368–14 (1993), will not provide a means of formally ending the dispute. Rather, the majority's rule invites a "second ordeal[,]" *see Federal Practice, supra*, at 15, by way of a jury trial. Accordingly, the majority's holding poses the probability that an employee who prevails before the commission will again have to "endure the harrowing ordeal of litigation[.]" *Federal Practice, supra*, at 13.

Third, allowing duplicative adjudication increases the burden upon litigants and the judicial system, contrary to the express policies of this court. What was tried in the administrative hearing before the commission will again be retried before a jury in court. *See Moss v. American Int'l Adjustment Co.*, 86 Hawai'i 59, 65, 947 P.2d 371, 377 (1997) (noting that this court "has recognized the importance of the efficient use of judicial resources" (citations omitted)); *cf. Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i Ltd.*, 76 Hawai'i 277, 294, 875 P.2d 894, 911 (1994) (noting that a purpose of *res judicata* is to "dispense with the delay and expense of two trials on the same issue" (citations omitted)); *Tradewind Ins. Co. v. Stout*, 85 Hawai'i 177, 184, 938 P.2d 1196, 1203 (App.1997) (observing that the purpose of preventing duplicative litigation is "to protect litigants from the burden of relitigating an identical issue with the same party . . . [and to] promote[ ] judicial economy by preventing needless litigation"); *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (explaining that a function of *res judicata* is "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate[,] protects their adversaries from the expense and vexation attending multiple lawsuits, [and] conserves judicial resources").

Fourth, contrary to HRS § 368–16(b), which states that "[a] complainant and an employer shall have a right of appeal from a final order of the commission[,]" allowing only the employer to obtain a retrial deprives the employee of judicial review of the commission's order as prescribed in HRS § 368–16(b). Thus the majority, in effect, repeals that statutory provision. In retrial before a jury, the determinations made by the commission are legally jettisoned, becoming irrelevant in the court trial and in any resulting appeals from the trial.

Fifth, the provision in HRS § 368–1 that expressly provides that there shall be a uniform procedure for enforcement, is violated. As mentioned, under the majority's approach, the present system is converted into one that extends an employer two opportunities to prevail on the outcome. Significantly, it is not unforeseeable that a jury verdict may conflict with a prior decision of the commission. Accordingly there will be two opposing decisions rendered in separate contested proceedings in the same case. Such a consequence will breed public distrust in the ultimate disposition of discrimination cases.

Sixth, under the system now created by the majority, an employee may have to endure an administrative hearing, a *de novo* trial, and any subsequent appeals with all the attendant extra costs and delay before any disposition is obtained. The majority's approach will increase the expenses borne by an employee, even though the statute was designed to minimize such expenses.

Seventh, under HRS § 368–3 (Supp.2001), the commission's responsibility "[t]o receive, investigate, and conciliate complaints alleging any unlawful discriminatory practice" without charge to the complainant is subverted. However, under the majority's decision, an employee will be wisely advised to hire an attorney for the administrative proceeding in anticipation that such legal representation will be necessary in a subsequent jury trial. "Such an outcome would waste time, monies, and lead to inconsistent and unpredictable application of the law, results which would hamper, not further, the aforementioned public policies." *Moss*, 86 Hawai'i at 65, 947 P.2d at 377. The majority's formulation is distinctly at odds with the legislative intent of HRS § 368–3, namely to resolve complaints in an expeditious and less costly manner through an administrative hearing process.

Eighth, the majority effectively abrogates the powers and functions of the HCRC granted under HRS § 368–3(5) to "order ap-

propriate *legal* and *equitable* relief or affirmative action when a violation is found[,]" (emphases added), and under HRS § 368–17 (Supp.2001) to award "compensatory and punitive damages and legal and equitable relief[.]"[3] As indicated, the majority holds that an employer is "entitled to a jury trial on any claims that form the basis for an award of common law damages [*i.e.*, legal damages] by the HCRC." Majority opinion at 452, 71 P.3d at 403. The majority has in effect repealed the statutory grant of power to the commission to award legal damages, because any such award may be superceded by a jury verdict.

In addition, the majority states that the trial court shall hold an entirely new trial, thus indicating that any equitable determinations made by the commission will be subject to reversal, again implicitly overruling the commission's authority to make equitable awards. *See* majority opinion at 452 n. 12, 71 P.3d at 403 n. 12 (explaining that "the whole action is tried *de novo* in the circuit court[;]" and "[w]hen a jury is called upon to make findings in connection with both legal and equitable matters resting upon the same set of facts, the trial court is bound by the jury's findings of fact when making its equitable determinations[ ]") (quoting *Lee v. Aiu*, 85 Hawai'i 19, 29, 936 P.2d 655, 665 (1997) (citations omitted)). Thus the majority has created an anomalous situation—if the commission renders only a decision requiring equitable relief, no right to a jury trial is allowed; on the other hand, if the commission awards any legal damages, any companion equitable award by the commission is subject to a jury trial.

The folly of appending a jury trial right to an existing framework is patent. The majority contends a "drastic course is unnecessary" and cites *Lavelle v. Massachusetts Comm'n Against Discrimination*, 426 Mass. 332, 688 N.E.2d 1331, 1335 (1997) as "persuasive[.]" Majority opinion at 452, 71 P.3d at 403. The primary question is not whether *Lavelle* is less "drastic," for multiple solutions can come to mind when we are faced in any case with a legal dispute. The crux is not the desirability of a particular course, but whether we are empowered to take it. Plainly, in my view, as to the course chosen by the majority, we are not.

Nor do I find *Lavelle* "persuasive[.]" Significantly, that decision did not confront the separation of powers issue. *Lavelle* is couched and qualified with speculation about the consequences flowing from it. In whatever way that decision is used to rationalize or the majority justifies the nullification of HRS chapter 368, it will not diminish the adverse effects on those the statute was designed to protect.

## II.

The majority's modification of the statute is plainly outside the scope of this court's authority.[4] It is the legislature that is empowered to enact, or to rewrite a statute. *See State v. Bloss*, 64 Haw. 148, 166, 637 P.2d 1117, 1130 (1982) ("It is not the role of the courts to rewrite statutes or ordinances in order to cure constitutional defects. That would be an unconstitutional exercise of legislative power." (Citations omitted.)); *State v. Rodrigues*, 63 Haw. 412, 416 n. 7, 629 P.2d

3. "Where a party does not appeal a final administrative decision that decision becomes final and *res judicata.*" *Hawkins v. State*, 183 Ariz. 100, 900 P.2d 1236, 1240 (Ariz.Ct.App.1995) (quoting *Guertin v. Pinal County*, 178 Ariz. 610, 875 P.2d 843, 845 (Ariz.Ct.App.1994)); *see also United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) ("When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." (Citations omitted)); *State v. Higa*, 79 Hawai'i 1, 8, 897 P.2d 928, 935 (" 'The doctrine of res judicata and collateral estoppel

also apply to matters litigated before an administrative agency.' " (Quoting *Santos v. State*, 64 Haw. 648, 653, 646 P.2d 962, 966 (1982).)), *reconsideration denied*, 79 Hawai'i 1, 897 P.2d 928 (1995).

4. It is apparent that footnote 12 on page 28 of the majority's opinion prescribes new law. For instance, there is no foundation in HRS chapter 368 or any other statute for the proposition that "[b]y electing to seek a jury trial ... the respondent waives his or her right to appellate review of the HCRC's final order in the circuit court, and the whole action is tried *de novo* in the circuit court." Majority opinion at 452 n. 12, 71 P.3d at 403 n. 12.

1111, 1114 n. 7 (1981) ("Judicial legislation should be practiced only interstitially." (Citing *Hayes v. Gill,* 52 Haw. 251, 254, 473 P.2d 872, 875 (1970).)); *State v. Abellano,* 50 Haw. 384, 386, 441 P.2d 333, 335 (1968) ("For this court to attempt to rewrite the ordinance to cure the constitutional defect would be an unconstitutional exercise of legislative power."); *cf. Biscoe v. Tanaka,* 76 Hawai'i 380, 383, 878 P.2d 719, 722 (1994) (recognizing that "the separation of powers doctrine applies to the Hawai'i state government" and concluding that a department "may not exercise powers not so constitutionally granted . . . unless such powers are properly incidental to the performance by it of its own appropriate functions" (citations omitted)); *Pray v. Judicial Selection Comm'n,* 75 Haw. 333, 353, 861 P.2d 723, 732 (1993) (noting that the separation of powers doctrine is intended " 'to preclude a commingling of . . . essentially different powers of government in the same hands' and thereby prevent a situation where one department is 'controlled by, or subjected, directly or indirectly, to the coercive influence of either of the other departments' " (citations omitted) (ellipsis points in original)); *Augafa,* 92 Hawai'i at 470, 992 P.2d at 739 (holding that a court does not have the authority to direct the legislature to adopt a statute because such "action is not 'reasonabl[ly] necessary to effectuate [the court's] judicial power[,]' " (citation omitted), and is in violation of the separation of powers doctrine).

Fundamentally, this court avoids rewriting statutes for both constitutional and practical reasons. As to the former, it is recognized that the "constitution is violated where one branch invades the territory of another, regardless of whether the encroached-upon branch approves the encroachment." 1 N. Singer, *Sutherland Statutory Construction* § 3.06, at 55 (5th ed.1992–94). Thus, "neither the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy when the legislature has clearly and unambiguously spoken." *Sutherland Statutory Construction, supra* at 55.

The California Supreme Court addressed the separation of powers issue in *Kopp v. Fair Political Practices Comm'n,* 11 Cal.4th 607, 47 Cal.Rptr.2d 108, 905 P.2d 1248 (1995). In *Kopp,* the California court emphasized that "it is *impermissible* for a court to reform by supplying terms that disserve the Legislature's or electorate's *policy* choices." *Id.* at 1284 (underscored emphasis added, italicized emphasis in original). In a concurrence, Justice Mosk reasoned that "courts have no general authority by virtue of the judicial power to rewrite a statute, even to salvage its validity. Rewriting would amount to amendment." *Id.* at 1292 (Mosk, J., concurring). He noted that as a policy matter, "enactment of a statute would not be [the] end of the legislative process but only the beginning; it would not render order but only invite chaos." *Id.* at 1292.

Moreover, as a practical matter, this court is not suited to handle the myriad details involved in amending or modifying a statute. Over a period of decades, the legislature has, after long experience, created a detailed statutory scheme to discourage discriminatory conduct. Our proceedings do not allow for the participatory input of the public and other interested groups. We do not cultivate the expertise necessary to resolve matters of policy involved in creating a new statutory scheme.

Under either analysis, the majority lacks the constitutional authority to rewrite HRS chapter 368 in a fashion that ignores the legislative intent and policy factors which underlie that chapter. As stated *infra,* the legislative intent was to create a system that is accessible, expeditious, and cost efficient. The majority's rule, however, diminishes access, delays the process, and increases the costs.

III.

Turning to the merits of the case, the employers-Plaintiffs in this case argue that HRS § 368–12 and Hawai'i Administrative Rules (HAR) § 12–46–20 (1993),[5] which allow

---

5.  HAR § 12–46–20 states:
   **Notice of right to sue.**

   (a) A notice of right to sue shall authorize:

a person who files a complaint with the HCRC and who receives a "notice of right to sue" to "bring a civil action under ... chapter [368]," HRS § 368–12, but does not provide the same procedure to an employer, violates their right to equal protection of the laws inasmuch as it impinges upon the fundamental right to a jury trial.[6] Accordingly, they submit that HRS § 368–12 should be ruled unconstitutional.

## IV.

Under the equal protection doctrine, HRS chapter 368 must satisfy either strict scrutiny or rational basis review. This court has held that "[w]henever a denial of equal protection of the laws is alleged, as a rule our initial inquiry has been whether the legislation in question should be subjected to 'strict scrutiny' or to a 'rational basis' test."[7] *Baehr v. Lewin*, 74 Haw. 530, 571, 852 P.2d 44, 63 (1993) (quoting *Nakano v. Matayoshi*, 68 Haw. 140, 151, 706 P.2d 814, 821 (1985)). Strict scrutiny is ordinarily applied where laws involve suspect classifications or fundamental rights, and rational basis review is traditionally applied in all other situations. *This court has applied strict scrutiny analysis to laws classifying on the basis of suspect categories or impinging upon fun-*

(1) *A complainant alleging violations of chapters 368*, 378 [regarding illegal discriminatory employment practices], or 489 [addressing discrimination in public accommodations], HRS, *to bring a civil suit pursuant to section 368–12*, HRS, within ninety days after receipt of the notice;

. . . .

(b) A request, in writing, may be made to the executive director to issue a notice of right to sue:
(1) At any time after the filing of a complaint with the commission, and no later than three days after the conclusion of the scheduling conference provided for in section 12–46–19, *by a complainant alleging violations of chapters 368*, 378, or 489, HRS;

. . . .

(c) The commission's executive director *shall issue a notice of right to sue* provided that the commission has not:
(1) Previously issued a notice;
(2) Entered into a conciliation agreement to which the complainant is a party; or
(3) Filed a civil action.
(d) *The commission's executive director shall issue a notice of right to sue:*

*damental rights expressly or impliedly granted by the constitution,* in which case the laws are presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications, and that the laws are narrowly drawn to avoid unnecessary abridgments of constitutional rights.

By contrast, *where suspect classifications or fundamental rights are not at issue, this court has traditionally employed the rational basis test.* Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest. Our inquiry seeks only to determine whether any reasonable justification can be found for the legislative enactment.

*Id.* (emphases added) (citations, quotation marks and brackets omitted). Thus, strict scrutiny review applies to HRS § 368–12 if it either 1) discriminates against a suspect class or 2) violates a fundamental right.

Similar to federal case law, our decisions hold that "[a] suspect classification is one where the class of individuals formed has been 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian

(1) Upon dismissal of the complaint pursuant to section 12–46–11; or
(2) Where the commission has entered into a conciliation agreement to which the complainant is not a party pursuant to section 12–46–15(d).
(Boldfaced font in original.) (Emphases added.)

6. Article I, section 13 of the Hawai'i Constitution reads:

In suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved. The legislature may provide for a verdict by not less than three-fourths of the members of the jury.

7. The United States Supreme Court has also formulated an intermediate "substantial relationship" test in an equal protection analysis and applied it to gender-based classifications. *See, e.g., Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

political process.'" *State v. Hatori*, 92 Hawai'i 217, 225, 990 P.2d 115, 123 (App.1999) (quoting *State v. Sturch*, 82 Hawai'i 269, 276 n. 8, 921 P.2d 1170, 1177 n. 8 (App.1996)); *see also In re Application of Herrick*, 82 Hawai'i 329, 346 n. 14, 922 P.2d 942, 959 n. 14 (1996). The removal provision differentiates only between complainants and employers in HCRC proceedings. Plainly, Plaintiffs, as employers in the HCRC proceeding, did not belong to a suspect class, nor do they claim such status.

With respect to whether HRS § 368–12 impinges on a fundamental right, the question is whether the right is central to traditional notions of liberty:

> [I]n a concurring opinion [in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)], Justice Goldberg observed that judges "determining which rights are fundamental" must look not to "personal and private notions," but
>
>> to the "traditions and collective conscience of our people" to determine whether a principle is "so rooted there ... as to be ranked as fundamental." ... *The inquiry is whether a right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' ...."*
>
> *Id.* at 493 [85 S.Ct. 1678] (Goldberg, J., concurring) (citations omitted).

*Baehr*, 74 Haw. at 556, 852 P.2d at 57 (brackets omitted) (ellipses points in original) (emphasis added). It is easily confirmed that the right to a jury trial is a fundamental right. *See* Haw. Const., art. I, § 13 ("The right of trial by jury as given by the Constitution or a statute of the State or the United States shall be preserved to the parties inviolate."); *see also Mehau v. Reed*, 76 Hawai'i 101, 110, 869 P.2d 1320, 1329 (1994) ("The right to jury trial is inviolate in the absence of an unequivocal and clear showing of a waiver of such right either by express or implied conduct." (Citations and brackets omitted.)). Hence, Plaintiffs maintain that the removal procedure infringes upon their right to a jury trial. The "right" involved, however, is not the right to a jury trial;

rather the procedure challenged is the opportunity afforded to employees to remove the case from an administrative proceeding to a judicial forum.

### V.

### A.

First, it should be clear that the exercise of the removal provision by a complainant does not automatically or inevitably result in a jury trial. Under HRS § 368–12, the complainant is entitled to make a request for the right to sue in court. While in many cases a complainant making the request may elect a jury to hear the court case, he or she could instead choose a trial before a judge only. Manifestly, then, resort to the removal provision does not outright grant the right to a jury trial to the complainant and deny it to an employer. Therefore, it is not the right to a *jury trial* per se that is afforded the complainant, but the opportunity to choose a different forum.

### B.

If a complainant does not remove the case from the HCRC agency process, as is the case here, both the complainant and the employer will be afforded the same rights in the HCRC proceedings. On the other hand, if a complainant chooses to remove the case, *either* the complainant or the employer may elect to have a jury proceeding in the circuit court. Thus, once a complainant exercises his or her "right to sue," the complainant and employer(s) in HCRC proceedings alike have the opportunity to request a jury trial—either or both may exercise their rights to a jury trial (when a complainant chooses to transfer the case to court) or both cannot do so (when a complainant chooses an administrative hearing). The question then is not whether Defendants–Appellants Darryllynne Sims and Tammy Quinata have been denied access to a jury trial, but whether the option to choose a *particular forum* is a fundamental constitutional right. In that regard, it cannot be said that the right to choose a particular forum "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice

which lie at the base of all our civil and political institutions.' " *Baehr,* 74 Haw. at 556, 852 P.2d at 57 (quoting *Griswold,* 381 U.S. at 493, 85 S.Ct. 1678 (Goldberg, J., concurring)).

## VI.

Hence, inasmuch as HRS § 368–12 involves the removal of the case from an administrative proceeding to a judicial one rather than the right to select a jury trial, a rational basis test is applicable. The rational basis test involves two parts:

> We apply a two-step test to determine whether a statute passes constitutional scrutiny under the rational basis test. [*See* ] *Del Rio v. Crake,* 87 [Hawai'i] 297, 305, 955 P.2d 90, 98 (1998). *"First, we must ascertain whether the statute was passed for a legitimate governmental purpose." Id.* (citations omitted). *Second, if the purpose is legitimate, the court must determine whether · the statute rationally furthers that legitimate government interest.* [*See* ] *[i]d.* In making that inquiry, "a court will not look for empirical data in support of the statute. *It will only seek to determine whether any reasonable justification can be conceived to uphold the legislative enactment." Id.* ( [italicized] emphasis in original) (citing *Housing Fin. & Dev. Corp. v. Castle,* 79 [Hawai'i] 64, 86, 898 P.2d 576, 598 (1995)). *In other words,* could "the Legislature have rationally believed that the statute would promote its objective." *Del Rio,* 87 [Hawai'i] at 305, 955 P.2d at 98.

*State v. Friedman,* 93 Hawai'i 63, 73–74, 996 P.2d 268, 278–79 (2000) (emphases added) (brackets and ellipsis points omitted); *see also Sturch,* 82 Hawai'i at 276, 921 P.2d at 1177 (explaining that, under the rational basis test, " '[t]he test of constitutionality is whether [the] statute has a rational relation to a legitimate state interest' " (quoting *Maeda v. Amemiya,* 60 Haw. 662, 669, 594 P.2d 136, 141 (1979))).

Applying the rational basis test, it is evident that the prevention of discrimination and the enforcement of anti-discrimination laws embodies a legitimate government purpose. *Cf. Pollard v. E.I. DuPont de Nemours, Co.,* 213 F.3d 933, 946 (6th Cir.2000) (characterizing the making of "reasonable damages available to all other victims of intentional discrimination without being forced to limit the damages already available to victims of racial and ethnic discrimination" as a "legitimate purpose"), *reversed on other grounds by, Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Moreover, as HRS chapter 368 meets the higher standards of strict scrutiny, *see infra* Parts VII. & VIII., it *a fortiori* satisfies a rational basis test.

## VII.

### A.

Assuming, *arguendo,* that the choice of forum under HRS § 368–12 must be subjected to a strict scrutiny analysis, the removal procedure both serves a compelling state interest and is narrowly-tailored to meet that interest. In applying a strict scrutiny analysis, this court presumes such laws "to be unconstitutional unless the state shows *compelling state interests* which justify such classifications, and that *the laws are narrowly drawn* to avoid unnecessary abridgments of constitutional rights." *Baehr,* 74 Haw. at 571–72, 852 P.2d at 63–64 (citations, brackets and internal quotation marks omitted) (emphases added). To satisfy the strict scrutiny test, then, it must be demonstrated that (1) HRS § 368–12 fulfills a compelling state interest, and (2) this statute is narrowly drawn.

### · B.

Without a doubt,[8] the prevention of discrimination in the State of Hawai'i serves a compelling state interest. The Hawai'i Constitution mandates that an individual will not "be denied the enjoyment of the person's civil rights or be discriminated against[.]" Haw. Const. Art. I § 5. In consonance with this guarantee, the legislature adopted HRS

---

8. No party contends that the prevention of discrimination is not a compelling state interest. Even Plaintiffs "do not dispute that the prevention of unlawful discrimination could qualify as a 'compelling state interest[.]' "

chapter 368 to provide "a forum [in the form of the HCRC] which is accessible to any [person] who suffers an act of discrimination". Stand. Comm. Rep. No. 372, in 1989 House Journal, at 984. The intent was to "establish a strong and viable commission with sufficient ... enforcement powers to effectuate the State's commitment to preserving the civil rights of all individuals." Stand. Comm. Rep. No. 372, in 1989 House Journal, at 984.

Hawai'i's consistent legislative efforts to eliminate discrimination have been repeatedly recognized by this court. *See Hyatt Corp. v. Honolulu Liquor Comm'n*, 69 Haw. 238, 244, 738 P.2d 1205, 1209 (1987) (commenting on Hawai'i's anti-discrimination laws and stating that "[t]he strength of this expressed public policy ... is beyond question"); *Furukawa v. Honolulu Zoological Soc'y*, 85 Hawai'i 7, 17, 936 P.2d 643, 653, ("As a remedial statute designed to enforce civil rights protections and remedy the effects of discrimination, Chapter 368 should be liberally construed in order to accomplish that purpose." (Quoting *Flores v. United Air Lines*, 70 Haw. 1, 757 P.2d 641 (1988).)), *reconsideration denied*, 85 Hawai'i 196, 940 P.2d 403 (1997).

The legislature enacted HRS chapter 368 "to more effectively enforce the State's discrimination laws," Stand. Comm. Rep. No. 1190, in 1989 House Journal, at 1269, and to "establish[ ] a uniform procedure for the handling of discrimination complaints by the commission which ensures expeditious processing while protecting due process rights and access to justice for all complainants." Stand. Comm. Rep. No. 739, in 1989 Senate Journal, at 1085. The chapter itself expressly states that it creates a "mechanism which provides for a *uniform procedure* for the enforcement of the State's discrimination laws[.]" HRS § 368–1 (emphasis added).

In that regard, it is plain that HRS § 368–12 rationally furthers the objective of preventing discrimination. The legislative history of that section is silent as to the removal procedure. But where, as here, the legislative history of a statute does not expressly address the statute, "we may consider how the legislature would have intended the legislation to be applied." *Sturch*, 82 Hawai'i at 278, 921 P.2d at 1179. HRS chapter 368 was enacted as a response to a perceived ineffectual enforcement of discrimination laws.

Presently, statutorily mandated enforcement responsibilities for the State's discrimination laws are divided primarily among several agencies within the department of commerce and consumer affairs. Enforcement of discrimination laws is only one of many other important functions of these departments and the enforcement programs must compete with other departmental programs for priority status. *Typically, the enforcement agencies are hampered in their delivery of services* because of limited fiscal and personnel resources. Conf. Com. Rep. No. 289, in 1988 Senate Journal, at 717 (emphasis added.) In that light, several rational justifications for the provision can be perceived as furthering the overall purpose of the statute.

For example, as HCRC argues, it may reasonably be posited that the legislature intended that only complainants should have the right to remove cases because: (1) employers could transfer cases to court, burdening complainants with the financial demands of court litigation and excluding from a remedy those complainants who would be unable to bear litigation expenses; (2) complainants should have the benefit of an administrative complaint-investigation-screening-conciliation process that would more speedily resolve claims; (3) if given the reciprocal right, employers may choose to remove the case at an early stage, thwarting the legislative objective of resolving the case in a more efficient and less expensive procedure than that obtainable in court litigation; and (4) frivolous civil rights complaints that might otherwise overburden the court could be administratively screened. Thus, HRS § 368–12 rationally furthers several legitimate state interests in providing a uniform, economical, and speedy resolution of civil rights complaints.

## VIII.

Plaintiffs allege that HRS § 368–12 is not narrowly drawn inasmuch as it *"completely denies* the right to jury trial to an [employer]

if the complainant chooses not to seek a right to sue letter."[9] (Emphasis in original.) This assumes that an employee is entitled to a jury trial upon filing of a complaint with the commission. The statute operates exclusively in the area of discrimination and mandates that any discriminated party file first with the commission. See HRS §§ 368–11 & 368–12 (1993). Hence, all complaints must be administratively initiated and no right to a judicial action under HRS § 368–12 exists, except in HRS § 515–9 (1993) proceedings involving housing discrimination, where one is expressly given.[10] In the event the complainant does not remove the case, plainly there is no discrimination inasmuch as none of the parties would have a jury trial and the clear intent of the statute was to give preference to an administrative disposition.

### A.

The removal provision is narrowly drawn, in light of the compelling state interest involved. As argued by the HCRC, the administrative agency mechanism encourages individuals with meritorious, but lower value claims, to initiate and pursue a discrimination complaint.[11] On the other hand, allowing individuals with strong liability cases to file in court encourages the vigorous enforcement of state anti-discrimination laws and creates a body of case law that guides employer-employee interactions.

As the legislature implicitly found, allowing an employer to choose the forum would allow employers to transfer a case to circuit court in a situation where an employee could not afford the time or expense necessary to litigate a claim in court. At trial, the HCRC Executive Director attested that "few private plaintiffs' attorneys specialize in discrimination cases" and those that do often require substantial client deposits, which are unaffordable by most civil rights complainants. Thus, any other approach would frustrate the compelling state interest behind HRS § 368–12 and would not be "narrowly drawn."[12] See Baehr, 74 Haw. at 571, 852 P.2d at 63.

### B.

As mentioned, prior to the enactment of HRS chapter 368, the legislature found that previous statutory schemes had failed to effectively enforce anti-discrimination laws. See Legislative Auditor of Hawai'i, Rep. No. 89–8, A Study on Implementation of the Civil Rights Commission, 15–16 (1989) [hereinafter, Auditor's Report] (finding that agencies lacked the resources to investigate and prosecute discrimination claims properly). Similar to this case, in McCloskey v. Honolulu Police Dept., 71 Haw. 568, 577–79, 799 P.2d 953, 958–59 (1990), this court recog-

9. Plaintiffs also argue that HCRC cited to evidence in its opening brief regarding this issue that was not been presented to the trial court at the time the court considered the summary judgment motion but, rather, that such evidence was submitted subsequently, at the motion to stay injunction. Because it is unnecessary to consider such evidence in rendering a decision in this case, whether HCRC cited to inappropriate evidence is immaterial.

10. See discussion infra, Part X.

11. This system has been very effective in handling and resolving complaints. HCRC attests that in 1999–2000 the commission considered 660 complaints of discrimination and issued 44 determinations that cause existed. Thus, a majority of the complaints were resolved by the HCRC, presumably through a determination that no cause existed, mediation, or pre-determination settlements. These statistics serve to illustrate the effectiveness of the current system. As noted infra, other approaches have been tried by the legislature, but have failed.

12. SCI cites the Federal Equal Employment Opportunity Commission (EEOC) as an example of a model that protects public interests, while also allowing an employer access to a jury trial. Under federal law, should settlement efforts by the EEOC fail against a private employer, then the EEOC may initiate a lawsuit against the employer in the United States district court. See 42 U.S.C. § 2000e–5(f)(1) (1994). A complainant has a right to intervene in this litigation.

There is, however, nothing to demonstrate the similarity between this national statute and the decades of experience that Hawai'i has had in addressing discrimination, particularly in light of express legislative findings that previous efforts had failed as a result of the burden and expense of litigation. To follow an EEOC approach would force the HCRC and the claimant, if he or she wishes representation in the suit, to bear the expense of litigation. This goes directly against the purported objectives of the HCRC.

nized that ineffective prior methods of investigating drug use could not be categorized as less restrictive for purposes of a fundamental right. In *McCloskey*, a police officer argued that a mandatory urine drug testing program violated "her right of privacy as guaranteed by article I, section 6[ ] of the Hawai'i Constitution." *Id.* at 573, 799 P.2d at 956. This court concluded that drug testing was the least restrictive manner to curb drug use because "[i]n the past, the traditional method of investigation by direct observation ha[d] proven to be ineffective ... [and] also ineffective was the use of criminal investigations." *Id.* at 577, 799 P.2d at 958.

As the legislature has noted, and previous history has demonstrated, prior approaches failed to protect employees against discrimination. Thus, those approaches cannot be considered more "narrowly drawn[,]" *Baehr*, 74 Haw. at 571, 852 P.2d at 63, under the circumstances as they do not accomplish the compelling state interest of reducing and eliminating discrimination.

### IX.

Citing *Baehr*, 74 Haw. at 581, 852 P.2d at 67, Plaintiffs argue that statutes that "den[y] different classes of persons *disparate access to a fundamental civil right*" do not allow for the equal enjoyment of substantive rights. (Italicized and underscored emphasis in original). But *Baehr* itself is distinguishable inasmuch as it focused on the suspect classification prong of the strict scrutiny test, rather than the fundamental rights question. In any event, any holding in *Baehr* regarding fundamental rights is not applicable to the instant case because, as discussed *supra*, removal to a judicial forum from a HCRC administrative proceeding is not a fundamental right.

Moreover, as alluded to before, Plaintiffs are not denied equal access to a jury trial. Upon an exercise of the right to sue, both Plaintiffs and Defendants have the same opportunity to request a jury trial. What Defendants are granted is the opportunity to continue pursuing their claims in an administrative setting or to bring their cases in court. That legislative dispensation afforded Defendants employees is supported by rational objectives underlying HRS § 368–12. *See* discussion *supra.*

### X.

Plaintiffs urge that HRS § 368–12 is over-inclusive because it prevents employers in HCRC proceedings from opting out of the process, even where the complainant can afford the costs of a circuit court trial. "In those cases," Plaintiffs argue, "the purported policy justification for the denial of the constitutional right to [employers] is not served[,]" resulting in a failure to meet the strict scrutiny test.

Plaintiffs' argument, however, pays heed to only one aspect of the policy underlying HRS chapter 368. That chapter also intended to ensure efficient and uniform, *i.e. consistent,* enforcement of the state's anti-discrimination laws. The inclusion of complainants who may be able to afford the expenses of court litigation would not be inconsistent with such goals. Plaintiffs also maintain that the statute is underinclusive because it does not include housing discrimination respondents in HRS § 515–9 proceedings [13] in the group precluded from opting out.

It is unclear how the claimed underinclusiveness in fact violates Plaintiffs' *own* equal protection rights. In any event, "[a] statute does not violate the equal protection clause merely because it could have included other persons, objects, or conduct within its reach." *State v. Freitas,* 61 Haw. 262, 273, 602 P.2d 914, 923 (1979) (citing *James–Dickinson Co. v. Harry,* 273 U.S. 119, 125, 47 S.Ct. 308, 71 L.Ed. 569 (1927).) This is because,

"[t]he legislature is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where

13. HRS § 515–9 provides that "[t]he civil rights commission has jurisdiction over the subject of real property transaction practices and discrimination made unlawful by this chapter." It also states that "[c]hapter 368 to the contrary notwithstanding, after a finding of reasonable cause, [HCRC has the power] to notify the complainant, respondent, or aggrieved person on whose behalf the complaint was filed, that an election may be made to file a civil action in lieu of an administrative hearing." HRS § 515–9(3).

the need is deemed to be the clearest." *Miller v. Wilson,* 236 U.S. 373, 384, 35 S.Ct. 342, 59 L.Ed. 628 (1915). And "if the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied." *Id.*

*Id.* at 273–74, 602 P.2d at 923 (some parentheses omitted). By attacking the classification, Plaintiffs bear the burden of showing that it is arbitrary and capricious. *See id.* at 272, 602 P.2d at 922 ("[B]ecause a statute is presumed to be constitutional, the party challenging the constitutionality of a statute on equal protection grounds bears the heavy burden of showing that the statute is arbitrary and capricious, and as such, objectionable." (Footnote and citations omitted.)). They have failed to do so here.

Moreover, citing Standing Committee Report No. 627–92, in 1992 House Journal, at 1126, HCRC explains that, unlike HRS chapter 368, HRS § 515–9 was created "to conform [c]hapter 515 with the federal Fair Housing Amendments Act, thereby avoiding decertification of the HCRC by [the federal] H[ousing and] U[rban] D[evelopment agency]." Indeed, the stated purpose of the statute "is to conform real estate transactions law to the Federal Fair Housing Amendments Act of 1988, which protects the disabled from housing discrimination." Stand. Com. Rep. No. 627–92, in 1992 House Journal, at 1126. Thus, Plaintiffs have failed to establish how the refusal to apply the complainant-only removal provision to chapter 515 cases was arbitrary and capricious.

## XI.

Although not dispositive to my analysis, I believe the majority errs in holding that the "public rights" doctrine would not be applicable to the immediate case. The United States Supreme Court has held that there is no right to a jury trial under the Seventh Amendment where Congress has assigned the adjudication of "public rights" to a government agency. Thus,

> [i]f a claim that is legal in nature asserts a "public right," as we define that term . . ., then the Seventh Amendment does not entitle the parties to a jury trial if Congress assigns its adjudication to an administrative agency . . . of equity. The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of "private right."

*Granfinanciera v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (citations omitted). In *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) (holding that, when Congress enacted the Occupational Safety and Health Act of 1970 and provided for civil penalties for its enforcement, thereby creating new "public rights," and then assigned adjudications of their enforcement to an administrative agency, lack of a jury trial at the proceedings did not violate the Seventh Amendment), the Court explained that,

> [a]t least in cases in which "public rights" are being litigated, e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact[,] *the Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible.*

*Id.* at 450, 97 S.Ct. 1261 (emphasis added.). The *Atlas Roofing* court concluded that, "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'" *Id.* at 455, 97 S.Ct. 1261. In *Granfinanciera,* the Court clarified what it meant by "public rights" as opposed to a "private right":

> Although we left the term *"public rights"* undefined in *Atlas,* we cited *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) approvingly. In *Crowell,* we *defined "private right" as "the liability of one individual to another under the law as defined,"* id. at 51 [52 S.Ct. 285], *in contrast to cases that "arise between the Government and persons subject to its authority in connection with the perfor-*

*mance of the constitutional functions of the executive or legislative departments."* *Id.* at 50, 52 [52 S.Ct. 285].

*Granfinanciera,* 492 U.S. at 51 n. 8, 109 S.Ct. 2782 (emphases added). It pointed out that, "[i]n certain situations, of course, Congress may fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable." *Id.* at 52, 109 S.Ct. 2782 (emphasis in original) (citations omitted). However, "[u]nless a legal cause of action involves 'public rights,' Congress may not deprive parties litigating over such a right of the Seventh Amendment's guarantee to a jury trial." *Id.* at 53, 109 S.Ct. 2782.

Thus a private dispute may be subject to a comprehensive regulatory scheme in which the government is involved. In *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the Court examined "whether Article III of the Constitution prohibits Congress from selecting binding arbitration ... as the mechanism for resolving disputes among participants in [the] F[ederal] I[nsecticide,] F[ungicide, and] R[odenticide Act]'s [ (FIFRA) ] pesticide registration scheme." *Id.* at 571, 105 S.Ct. 3325. The Court determined that it did not. *See id.* Justice Brennan, in his concurring opinion (which is repeatedly cited to in *Granfinanciera* ), explained that

> the dispute arises in the context of a federal regulatory scheme that virtually occupies the field.... *This case,* in other words, *involves* not only the congressional prescription of a federal rule of decision to govern a private dispute but also *the active participation of a federal regulatory agency in resolving the dispute. Although a compensation dispute under FIFRA ultimately involves a determination of the duty owed one private party by another, at its heart the dispute involves the exercise of authority by a Federal Government arbitrator in the course of administration of FIFRA's comprehensive regulatory scheme.* As such, it partakes of the characteristics of standard agency adjudication.

*Id.* at 600, 105 S.Ct. 3325 (Brennan, J., concurring) (emphases added) (citation omitted).

The majority contends that the public rights doctrine does not apply in this case because the HCRC sought monetary damages and is seeking to enforce a private right in the adjudication of liability between one individual and another. In deciding civil rights cases in the past, this court has looked to the federal courts for guidance. *See Furukawa,* 85 Hawai'i at 13, 936 P.2d at 650 (noting that while federal law and "a federal court's interpretation ... [of that law] is not binding on this court's interpretation of civil rights laws, it can be a useful analytical tool"). Plainly, in the present case, a public right is involved. In *Equal Employment Opportunity Com'n v. Waffle House, Inc.,* 534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002), the United States Supreme Court held that the fact that an employee had signed a mandatory arbitration agreement does not preclude the Equal Employment Opportunity Commission (EEOC) from seeking different types of relief, even victim-specific relief. *See id.* at 295, 122 S.Ct. 754. The Supreme Court reasoned that "the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, *even when it pursues entirely victim-specific relief.* To hold otherwise would undermine the detailed enforcement scheme created by Congress[.]" *Id.* at 296, 122 S.Ct. 754 (emphasis added). Thus, contrary to the majority's position, the HCRC is enforcing public rights even when it seeks monetary damages to be awarded one individual from another.

In light of the purpose and provisions of HRS chapter 368, *see supra,* the rationale set forth in *Atlas Roofing, Waffle House,* and *Granfinanciera* is applicable. Applying it to the instant case, HRS chapter 368 obviously pertains to "public rights." In enacting HRS chapter 368, the legislature acted for a valid legislative purpose, that of ensuring the consistent and effective enforcement of civil rights. *See* discussion *supra.* The enactment of chapter 368 was manifestly within the legislative power. *See* Haw. Const. Art. III, § 1 ("The legislative power of the State shall be vested in a legislature[,] ... [s]uch

power shall extend to all rightful subjects of legislation not inconsistent with this constitution or the Constitution of the United States.") Chapter 368 is concerned with government enforcement of public discrimination laws and not strictly with "private rights" such as "the liability of one individual to another."

Under chapter 368, the State, through the HCRC, is authorized to sue persons to enforce public rights in connection with enforcing anti-discrimination laws, an executive function. *See Furukawa,* 85 Hawai'i at 17, 936 P.2d at 654 ("The Commission provides the mechanism for enforcement of discrimination law in Hawai'i. As a remedial statute designed to enforce civil rights protections and remedy the effects of discrimination, Chapter 368 should be liberally construed in order to accomplish that purpose." (Citations omitted.)).

Consequently, article I, section 13 of the Hawai'i Constitution would not "prohibit [the legislature] from assigning the fact finding function and initial adjudication to an administrative forum," *Atlas Roofing,* 430 U.S. at 449, 97 S.Ct. 1261, rather than to a court. In that respect, the right to jury trial in the Hawai'i Constitution does not preclude the legislature "from assigning their resolution to a forum in which jury trials are unavailable." *Id.* Were "private rights" involved, however, the right to jury trial, as embodied in our constitution, would prevail.

As in *Thomas,* HRS chapter 368 requires HCRC's active participation in the context of a comprehensive state regulatory scheme in resolving the dispute between Defendants and Plaintiffs. Although the procedures involve a determination of the duty owed by one party to another, the regulatory scheme involves the exercise by HCRC of its powers in administering HRS chapter 368. Accordingly, contrary to the majority's view, the right to a jury trial may be deemed incompatible with the comprehensive regulatory scheme that the legislature has established for vindicating anti-discrimination "public rights."

1. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1), Lillian Koller, the current Director of the Department of Human Services,

### XII.

Accordingly, I must respectfully dissent from the majority's disposition and analysis in this case. I would vacate the court's final judgment issued on July 25, 2001, and remand the case for further proceedings consistent with this opinion.